# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DANIEL BURTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 13-cv-00769 |
| v. | ) |
| | ) Judge Andrea R. Wood |
| ILLINOIS CENTRAL RAILROAD | ) |
| COMPANY formerly d/b/a CANADIAN | ) |
| NATIONAL/ILLINOIS CENTRAL | ) |
| RAILROAD COMPANY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Plaintiff Daniel Burton worked as an assistant signalman for Defendant Illinois Central Railroad Company ("Illinois Central"). On May 13, 2011, Burton was laying cable for his employer when the tail end of the cable came loose from its spool and struck him above the knee, causing him to fall. Several days later, Burton was diagnosed with a knee contusion and a shoulder sprain. He continued to work with these injuries for some time before reporting them to his employer. After Burton reported his injuries, Illinois Central instituted a formal investigation and ultimately terminated his employment. Burton subsequently brought this action pursuant to the Federal Employers Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.*, and the whistleblower provision of the Federal Rail Safety Act ("FRSA"), 49 U.S.C. § 20109 *et seq*. Before the Court are the parties' cross-motions for summary judgment. (Dkt. Nos. 49, 52, 55.) For the reasons stated below, the Court finds that there are genuine issues of material fact with respect to both of Burton's claims and thus denies the parties' motions.

# FACTUAL BACKGROUND

The following facts are undisputed unless otherwise noted.

Burton was hired by Illinois Central in December 2010 as an assistant signalman. (Pl.'s Resp. to Def.'s Stmt. of Undisputed Facts ("SUF") re FRSA Claim ¶ 10, Dkt. No. 67.) His job duties included installing switches and wires, setting up and repairing crossing gates, and digging trenches for the wiring. (*Id.*) Burton reported to Illinois Central construction supervisors Michael Youngman and Charles Woodbridge. (*Id.*) He also worked under the direction of Illinois Central foremen. (*Id.* ¶ 12.) Foremen direct the on-site work of crew members but are not part of Illinois Central management; foremen play no role in hiring, firing, or promoting employees, cannot issue discipline or transfer employees, and do not make any decisions concerning employee benefits. (*Id.*)

Illinois Central is required by the Federal Railroad Administration to report certain accidents and injuries that occur while employees are working. Accordingly, Illinois Central instructs its employees that all injuries that occur on duty should be reported to a supervisor. (*Id.* ¶ 5.) This requirement is codified in Illinois Central's United States Operating Rule ("USOR") D, which provides:

> Employees must report promptly to the proper authority any injury sustained on duty or on company property. Notification of the injury must be made prior to the end of the employee's tour of duty and before leaving company property.

(*Id.* ¶ 6.) Burton received a copy of Illinois Central's injury reporting policy and received training on it. (*Id.* ¶¶ 13-14.)

Although there is evidence that Youngman instructed Burton and other employees that injury reports should be made to him or "another supervisor" (*id.* ¶ 14), the record does not indicate whether Rule D or any other rule promulgated by Illinois Central specifies what

2

constitutes a "proper authority" or "supervisor" for injury reporting purposes. Furthermore, there is some evidence that Illinois Central at least tacitly accepted that employees would not strictly comply with USOR D. Illinois Central foreman Howard McKeehan testified at his deposition that the USOR included a safety test that "specifies if you get hurt, you have the freedom to choose to either report it or not report it, depending on the injury. It's up to that individual." (McKeehan Dep. Tr. 48-49, Dkt. No. 56-6.) Thus, according to McKeehan, it is not unusual for an Illinois Central worker to suffer a minor injury, such as a cut, and not report it as an injury depending on the worker's choice and how badly the worker is hurt.[1] (*Id.*)

On May 13, 2011, Burton was assigned to work with a signal crew of co-workers assigned to lay power cable in trenches near Matteson, Illinois. (Def.'s Resp. to Pl.'s SUF ¶¶ 3, 6, Dkt. No. 64; Pl.'s Resp. to Def.'s SUF re FELA ¶ 6, Dkt. No. 68.) Burton was responsible for maintaining the spool of cable, which was suspended from a back-hoe, while the rest of the crew pulled the cable from the spool and laid it in the trenches. (Pl.'s Resp. to Def.'s SUF re FELA ¶ 7, Dkt. No. 68.) Because his designated task was to maintain the spool, Burton was expected to keep an eye on the unraveling cable, to yell for the crew to stop pulling or to slow down if the spool was spinning too fast, or otherwise to alert the crew if something unexpected occurred. (Pl.'s Resp. to Def.'s SUF re FELA ¶ 8, Dkt. No. 68.) Besides Burton, the other members of the work crew assigned to lay cable that day included Woodbridge, Jeffrey Irzyk, Brad Mazies, and Joel Datil. (Def.'s Resp. to Pl.'s SUF ¶ 6, Dkt. No. 64.) McKeehan, who was the foreman of this work crew, and Sidiky Kone, who would act as foreman of the group if McKeehan was unavailable, were part of the same work group but were not present at the time of this job. (Kone Dep. Tr. 16:3-8, Dkt. No. 56-3; McKeehan Dep. Tr. 16:12-14, Dkt. No. 56-6.)

---

[1] Illinois Central denies that the safety rules and company policy specify that if an employee gets hurt he has the choice or reporting it or not reporting it, depending on the injury. However, McKeehan's testimony indicates that employees are given some latitude in deciding whether or not to report an injury.

3

Irzyk and other members of the crew were pulling the cable,[2] while Burton's assignment was to stay by the reel to watch it in order to monitor whether the reel was spinning too fast—in other words, whether the cable was being released from the reel faster than the slack was being picked up by the crew pulling the cable. (Def.'s Resp. to Pl.'s SUF ¶ 18, Dkt. No. 64.) If that occurred, Burton was supposed to yell to the crew to slow down. (*Id.*)

The cable that was being unwound at this project was ordered by the railroad and came directly from the manufacturer; it was not unwound and placed on another spool for this project. (*Id.* ¶ 16.) Generally, the tail end of the cable would be secured to the reel, either by being tied with a rope or stapled, depending on the size, and the fastener would have to be removed in order to detach the cable from the spool. (*Id.* ¶ 21.) Although Burton had been assigned to this task on two prior occasions, he had never seen a spool with the tail or tag end unattached in the times he had protected the spool's unraveling or been in the shop to dismantle the spools. (Pl.'s Resp. to Def.'s Stmt. of Additional Facts ("SAF") ¶ 33, Dkt. No. 74.) Youngman, Irzyk, and McKeehan testified that they had seen the end of the cable not secured to the spool on prior occasions. (*Id.* ¶¶ 33, 35.) It was not generally possible, however, to determine before the cable was mostly pulled off of the reel whether the end of the cable was secured to the spool. (Pl.'s Resp. to Def.'s SUF re FELA ¶¶ 14-16, Dkt. No. 68.)

Perhaps for this very reason, McKeehan testified that a job briefing would generally include whether the cable would be pulled manually or with a backhoe, and on occasions where a backhoe was used, a work crew would determine how much cable was left on the spool before the rest was pulled off manually so that no one would get "helicoptered" or "smacked" by the

---

[2] It is unclear by what means the work crew was pulling the cable. At his deposition, Irzyk testified that he was pulling the cable by backhoe (Irzyk Dep. Tr. at 12:2-20, Dkt. No. 56-2.) However, other witnesses, including Burton, testified that the cable was pulled by hand. (*See* Burton Dep. at 76:8-77:3, 303:3-18, Dkt. No. 56-4.) It appears only Izryk testified that the cable was being pulled using a backhoe.

4

end of the cable. (Pl.'s Resp. to Def.'s SAF ¶ 35, Dkt. No. 74.) There is no evidence in the record regarding whether the job briefing on May 13, 2011 included any instruction regarding this hazard. For example, Woodbridge testified that he does not recall if the job briefing on May 13, 2011 included the contingency of the cable not being properly tagged. (Def.'s Resp. to Pl.'s SUF ¶ 31, Dkt. No. 64.)

As the crew pulled the cable, the reel began moving too fast and Woodbridge and others yelled to the crew pulling the cable to slow down. (*Id.* ¶ 19.) At this point, about half of the cable was unreeled. (*Id.*) When the last layer of cable was left on the reel, Woodbridge yelled for everybody to stop. (*Id.* ¶ 21.) At this time, he saw that the tail end of the cable was loose and had started to come out. (*Id.*) The "tail" end of the cable then shot out, striking Burton just above his right knee. (*Id.* ¶ 10; Pl.'s Resp. to Def.'s SUF re FELA ¶ 9, Dkt. No. 68.) After Burton was struck, he fell backwards and stumbled over a pile of debris consisting of the pallet that the cable reel was on, which was leaning against a mound of dirt, breaking his fall with his left arm.[3] (Pl.'s Resp. to Def.'s SUF re FELA ¶ 9, Dkt. No. 68.) Burton testified that he felt "excruciating" pain behind his right knee as a result of the blow from the tag end of the cable. (Pl.'s Resp. to Def.'s SUF re FRSA ¶ 16, Dkt. No. 67.) At the time, however, Burton believed that the pain would go away, he did not need medical treatment, and the injury would result only in bruising. (*Id.*)

At some point after Burton was struck by the end of the cable on May 13, Woodbridge gathered the work crew to have a group meeting to discuss a "close call incident." (Def.'s Resp. to Pl.'s SUF ¶ 15, Dkt. No. 64.) Burton testified that Woodbridge asked him whether he was "okay" at this safety meeting; Woodbridge denies that he spoke to Burton about his injury or the

---

[3] Illinois Central "denies" that Burton fell, citing testimony that none of Burton's coworkers saw him fall. (Def.'s Resp. to Pl.'s SUF ¶ 11, Dkt. No. 64.) However, Burton testified that he did fall after being struck by the cable (Burton Dep. Tr. 81:10-83:12, Dkt. No. 56-4) and Illinois Central does not identify evidence in the record that actually contradicts Burton's testimony.

5

incident, however. (*Id.*) Later that evening, Burton told Datil and Mazies that he had been hit by the cable and was in pain. (Pl.'s Resp. to Def.'s SUF re FRSA ¶ 17, Dkt. No. 67.) That evening, Burton and Datil told Kone, who arrived on the work site that evening to begin his shift the next morning, that Burton had been hurt when he was struck by the end of the cable. (Def.'s Resp. to Pl.'s SUF ¶ 25, Dkt. No. 64; Kone Dep. Tr. 15:18-16:14, Dkt. No. 56-3.)

Burton returned to work the morning after the incident, May 14, 2011, when Kone was serving as the acting foreman. (Def.'s Resp. to Pl.'s SUF ¶ 26, Dkt. No. 64.) Kone asked Burton about his leg, and Burton told Kone it was sore around the thigh. (*Id.*) Because Burton was in pain, Kone assigned him lighter duty. (*Id.*) On May 15, Burton again reported for work and did not participate in his normal work activities because of his pain; however, Burton did not discuss his injury or whether he should report it with anyone that day. (Pl.'s Resp. to Def.'s SUF re FRSA ¶ 19, Dkt. No. 67.) On May 16, Burton spoke with foreman McKeehan about being hit by the cable and being in pain, and he told McKeehan that he was unsure if he was injured and that he was a little stiff and sore. (*Id.* ¶ 20.)

After finishing his shift that day, Burton went to the emergency room of Silver Cross Hospital and told the doctor that he had been injured at work. (*Id.* ¶ 22.) X-rays were negative, but Burton was diagnosed with a knee contusion and shoulder sprain. (*Id.*) The doctor told him to rest his knee and shoulder and he would be fine. (Def.'s Resp. to Pl.'s SUF ¶ 39, Dkt. No. 64.) The doctor also prescribed Burton pain medication and told him to follow up with his primary care physician within the next two or three days.[4] (Def.'s SUF re FRSA ¶ 23, Dkt. No. 67.) On May 17 and 18, Burton called McKeehan to tell him that the doctor had prescribed rest and that he would not come to work. (Pl.'s Resp. to Def.'s SUF re FRSA ¶ 24, Dkt. No. 67.) Burton did

---

[4] Burton now denies that he was instructed to follow up with his primary care physician but, at his deposition, Burton clearly testified that he was instructed to do so. (Burton Dep. Tr. at 119-20, Dkt. No. 56-4.)

not speak with anyone other than his foreman about his injury, however. (Burton Dep. Tr. 123:21-124:21, Dkt. No. 56-4.) He was not scheduled to work again until the following Monday, May 23. (Pl.'s Resp. to Def.'s SUF re FRSA ¶ 24, Dkt. No. 67.) Burton returned to work on May 23 and performed his regular duties. (*Id.* ¶ 25.) He worked four days that week but was still in pain, and icing and elevating his injury because of the pain. (*Id.* ¶ 26.) He did not discuss his pain or injury with anyone that week, and he did not report the injury to Youngman even though he was at the worksite. (*Id.* ¶ 27.)

On May 31, 2011, Burton told his acting foreman, an individual from Mississippi named Byron, that he was going home because he was in pain. He was told to call his supervisor, Youngman, to advise him about how the injury occurred. (Def.'s Resp. to Pl.'s SUF ¶ 40, Dkt. No. 64.) Burton called Youngman and explained that he had been injured on May 13. (*Id.*) Burton testified that he finally reported his injury because he felt he could no longer perform his duties. (Pl.'s Resp. to Def.'s SUF re FRSA ¶ 28, Dkt. No. 67.) Youngman asked Burton if he wanted to report the injury, and Burton said he was unsure. Youngman told Burton that he had been required to report his injury by the end of his shift on May 13, his failure to do so was not good, and Youngman would call him back. (*Id.* ¶ 30.) Later that day, Youngman called Burton, this time with Youngman's supervisor, Senior Manager for Construction Tom Hilliard, on the call. (*Id.* ¶ 31.) Hilliard told Burton that if he wanted to report the injury he needed to come in the following day and fill out an injury form. (*Id.* ¶ 33.) So Burton reported to Illinois Central's administration building the next day to fill out an injury report. (*Id.* ¶ 34.) He met Hilliard in the parking lot. (*Id.*) Burton claims that during this encounter, Hilliard asked Burton if he was sure that he wanted to fill out the injury report. (Burton Dep. Tr. 170:12-20, Dkt. No. 56-4.) Hilliard gives a somewhat different account of the meeting in the parking lot; according to Hilliard, he

asked Burton how he was feeling. (Hilliard Dep. Tr. 16:1-17, Dkt. No. 56-8.) After the discussion with Hilliard, Burton then went inside the building to meet with Risk Mitigation Officer Larry Sands, at which time he completed Form 0475 required by the FRA. (Pl.'s Resp. to Def.'s SUF re FRSA ¶ 34, Dkt. No. 67.)

The day after Burton reported his injury, Hilliard ordered Youngman to initiate a formal investigation under the collective bargaining agreement into whether Burton violated any work rules by reporting his injury 18 days after it occurred. (*Id.* ¶ 35.) As part of this investigation, Hilliard instructed Youngman to get the facts related to the issue, so Youngman interviewed the individuals who worked with Burton from May 13 through 16 and examined the injury site. (*Id.* ¶ 37.) On June 2, 2011, Illinois Central sent Burton a notice of the formal investigation. (*Id.* ¶ 38.) During the investigative hearing on August 17, Burton was represented by his union and allowed to present witnesses and evidence and ask questions of witnesses. (*Id.*) A court reporter made an accurate transcript of the investigation. (*Id.*) During the formal investigation, Burton stated that he experienced "severe" pain when the cable struck him, but he thought he could work through it. (*Id.*) Burton also stated that he knew he was in pain the entire 18 days before he reported the injury, but he did not understand that he was injured until he reported it on May 31. (*Id.* ¶¶ 39-41.)

On August 26, 2011, Burton received a letter from Illinois Central stating that he was dismissed from service immediately. (Def.'s Resp. to Pl.'s SUF ¶ 68, Dkt. No. 64.) This was the first time that Burton had received any formal discipline in the five months that he worked for Illinois Central. (*Id.* ¶ 67.) Hilliard and Youngman determined what charges to bring against Burton in the formal investigation, and Hilliard made the decision to terminate Burton. (*Id.* ¶¶ 45, 46.) During Hilliard's deposition, he testified that in deciding what discipline to assess

Burton for his purported rule violation, he considered statements by employees involved in the investigation, work history, PMRC failures, employee audits, and rules. (Def.'s Resp. to Pl.'s SUF ¶ 47, Dkt. No. 64.) When pressed at his deposition, however, Hilliard could not recall any specific part of the investigation that led to his termination of Burton.[5] (Hilliard Dep. Tr. 27:14-23, Dkt. No. 56-8.) Hilliard represents that he has not disciplined an employee for reporting an injury. (Pl.'s Resp. to Def.'s SUF re FRSA ¶ 48, Dkt. No. 67.)

## DISCUSSION

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In seeking summary judgment, the moving party must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 324. A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).

---

[5] Although Illinois Central now denies it, Hilliard clearly testified at his deposition that he could not recall what evidence led to his termination of Burton. (Hilliard Dep. Tr. 27:14-23, Dkt. No. 56-8.)

9

A. Burton's FELA Claim

Section 1 of FELA provides that "[e]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. § 51. A relaxed standard of causation applies under FELA: "[u]nder this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers v. Missouri Pac. R. Co.*, 352 U.S. 500, 506 (1957). Thus, the plaintiffs' burden in a FELA action is significantly lighter than it would be in an ordinary negligence case. *Williams v. Nat'l R.R. Passenger Corp.*, 161 F.3d 1059, 1061 (7th Cir. 1998). Indeed, a FELA action may proceed past the summary judgment stage to get to a jury based upon "evidence scarcely more substantial than pigeon bone broth." *See Harbin v. Burlington N. Ry. Co.*, 921 F.2d 129, 132 (7th Cir. 1990). This is not to say, however, that a plaintiff in a FELA case may present no evidence whatsoever of negligence. A FELA plaintiff must "offer evidence proving the common law elements of negligence, including duty, breach, foreseeability, and causation," and a plaintiff who fails to produce "even the slightest of evidence" as to those elements will lose on summary judgment. *See Williams*, 161 F.3d at 1062.

Illinois Central argues that Burton's claim cannot survive summary judgment because he has failed to adduce evidence of foreseeability. Foreseeability in this context involves a showing of either actual or constructive notice on the part of the railroad. *Id.* "[A]n employer is not liable if it has no way of knowing that a potential hazard exists." *Id.*; *see also Geraty v. Ne. Ill. Reg'l*, No. 06-CV-0815, 2009 WL 691280, at *8 (N.D. Ill. Mar. 16, 2009) (citing *Kaminski v. Chicago*

*River & Ind. R. Co.*, 200 F.2d 1, 4 (7th Cir. 1952)) ("To be sure, when a defect is hidden from view, the potential for harm is less foreseeable").

Here, the undisputed evidence establishes that when a reel of cable is completely wound, it is impossible to discern whether the anchor end has been properly fastened to the reel. (Pl.'s Resp. to Def.'s SUF re FELA ¶¶ 14-16, Dkt. No. 68.) This is not dispositive of the foreseeability analysis, however. Youngman, Irzyk, and McKeehan all testified that they had seen instances when the end of the cable was not secured to the spool. (Pl.'s Resp. to Def.'s SAF ¶ 35, Dkt. No. 74.) Indeed, McKeehan testified that countermeasures were used to prevent workers from getting "helicoptered" or "smacked" by the end of an unsecured cable—the very thing that caused Burton's injury. (*Id.*) Because the record indicates that multiple workers on Burton's own work crew were conscious of a possible risk of the very injury Burton sustained, the Court finds that there is sufficient evidence of foreseeability for Burton to survive summary judgment on his FELA count.

Illinois Central cites a number of cases that it contends establish that the loose cable does not reach the foreseeability threshold to allow Burton to defeat summary judgment. (Def.'s Mem. re FELA at 5-8, Dkt. No. 53. In all of those cases, however, the events causing injuries were one-off occurrences and the plaintiffs were unable to adduce evidence that there was any forewarning of these incidents. In contrast, here the record indicates that an injury caused by unsecured "tag" ends of cable was a repeated (even if rare) occurrence. Under the relaxed standard of proof applicable to FELA claims, this is sufficient to survive summary judgment on the issue of foreseeability.

Illinois Central also argues that the Court should grant summary judgment in its favor because there is no legitimate issue of fact regarding whether it provided Burton with a

11

reasonably safe place to work. The company argues that Burton himself "was the precaution that [Illinois Central] put into place to control any dangerous conditions involved in the cable coming off the spool" by controlling the speed of the spool to "ensure the efficient unraveling of the cable and the safety of the crew." (Def.'s Mot. re FELA at 9, Dkt. No. 53.) But Illinois Central does not address how it undertook reasonable safety measures against the foreseeable risk of a loose end of cable striking Burton. The record indicates that this danger was sufficiently common that workers had been instructed to take precautions against such an injury. Yet there is no indication that Burton, who had been working for Illinois Central for only five months and had only performed this particular task twice, was ever informed about the possibility that the tag end of the cable could possibly be loose. A railroad may be held liable under FELA "when it knows or should know of a potential hazard in the workplace, yet fails to exercise reasonable care to inform and protect its employees." *Moreno v. Grand Victoria Casino*, 94 F. Supp. 2d 883, 893 (N.D. Ill. 2000) (quoting *Gallose v. Long Island R.R.*, 878 F.2d 80, 84–85 (2d Cir. 1989)). The record evidence shows that Burton's injury—being "smacked" or "helicoptered" by a loose end of cable—was a known potential hazard. (*See* Pl.'s Resp. to Def.'s SAF ¶¶ 33, 35, Dkt. No. 74.) Furthermore, although job instructions on some previous occasions included warnings concerning the potential danger of loose ends of cable, it is an open issue whether such a warning was provided on this occasion. (*Id.* ¶¶ 31, 35.) Accordingly, the Court finds that there is an issue of fact regarding whether Illinois Central provided a reasonably safe workplace within the meaning of FELA.

Although there is sufficient evidence for Burton to overcome Illinois Central's motion for summary judgment, the record does not support summary judgment in his favor either. There are issues of fact as to whether the incident was foreseeable, whether proper instructions were

provided during the job briefing, and whether the failure to provide these instructions constitutes negligence. Notwithstanding Burton's suggestion to the contrary, FELA's lower standard of proof does not allow a Court to grant summary judgment in a plaintiff's favor simply because he has adduced evidence sufficient to survive summary judgment. *Harbin*, 921 F.2d at 131 ("The lenient standard for ***avoiding*** summary judgment under the FELA merely mirrors the pro-plaintiff slant of the substantive law") (emphasis added).

### B. Burton's FRSA Retaliation Claim

The FRSA prohibits a rail carrier from discharging an employee who reports a work-related injury in good faith. 49 U.S.C. § 20109(a). FRSA claims are governed by the legal burdens of proof set forth in 49 U.S.C. § 42121. *See* 49 U.S.C. § 20109(d)(2)(A). To establish a *prima facie* case under the FRSA, Burton must demonstrate that "(i) he engaged in a protected activity; (ii) [Illinois Central] knew or suspected, actually or constructively, that he engaged in the protected activity; (iii) he suffered an adverse action; and (iv) the circumstances raise an inference that the protected activity was a contributing factor in the adverse action." *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 789 (8th Cir. 2014). If Burton establishes a *prima facie* case, the burden then shifts to Illinois Central to demonstrate by clear and convincing evidence that it would have terminated his employment in the absence of any alleged protected activity. *Id.*

The FRSA only protects an employee's "good faith act done . . . to notify, or attempt to notify, the railroad carrier or the Secretary of Transportation of a work-related personal injury." 49 U.S.C. § 20109(a)(4). According to Illinois Central, Burton cannot establish good faith because he was injured but did not report his injury for 18 days. But the railroad fails to cite any authority for the proposition that a delay in reporting an injury implicates the FRSA's "good faith" provision. Instead, the relevant inquiry is whether an FRSA plaintiff genuinely believes

13

that the injury being reported was work-related. *See, e.g., Cash v. Norfolk S. Ry. Co.*, No. 6:13-CV-00056, 2015 WL 178065, at *11 (W.D. Va. Jan. 14, 2015); *Koziara v. BNSF Ry. Co.*, No. 13-CV-834-JDP, 2015 WL 137272, at *6 (W.D. Wis. Jan. 9, 2015); *Davis v. Union Pac. R.R. Co.*, No. 5:12-CV-2738, 2014 WL 3499228, at *6-7 (W.D. La. July 14, 2014); *Ray v. Union Pac. R.R. Co.*, 971 F. Supp. 2d 869, 884 (S.D. Iowa 2013). Here, there is no suggestion that Burton has been disingenuous in claiming that his injuries were work-related. Accordingly, the Court denies Illinois Central's motion for summary judgment to the extent it asks the Court to find that Burton reported his injury in bad faith.

Illinois Central also contends that there is insufficient evidence to establish a causal connection between Burton's injury report and his termination. The FRSA incorporates by reference the rules and procedures applicable to whistleblower cases under the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR–21"). 49 U.S.C. § 20109(d)(2)(A). Thus, Burton may make his *prima facie* case if he can show that his injury report was "a contributing factor in the unfavorable personnel action alleged in the complaint." *Id.* (incorporating by reference 49 U.S.C. § 42121(b)(2)(B)(i)); *see also Araujo v. NJ Transit Rail Operations, Inc.*, 708 F.3d 152, 157 (3d Cir. 2013). Once a plaintiff makes a showing that the protected activity was a "contributing factor" to the adverse employment action, the burden shifts to the employer to demonstrate "by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior." 49 U.S.C. § 20109(d)(2)(A) (incorporating by reference 49 U.S.C. § 42121(b)(2)(B)(ii)).

Although the Seventh Circuit has not explicitly addressed the "contributing factor" analysis in the FRSA context, when analyzing similar language it has stated that "a 'contributing factor' is something less than a substantial or motivating one." *Addis v. Dep't of Labor*, 575 F.3d

688, 691 (7th Cir. 2009) (citing *Frobose v. Am. Sav. & Loan Ass'n*, 152 F.3d 602, 612 (7th Cir. 1998)). Congress defined "contributing factor" as "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Id.* (quoting *Marano v. Dep't of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993)). The "contributing factor" phrase "is specifically intended to overrule existing case law, which requires a whistleblower to prove that his protected conduct was a 'significant,' 'motivating,' 'substantial,' or 'predominant' factor in a personnel action in order to overturn that action." *Id.* (quoting *Marano*, 2 F.3d at 1140); *see also Ameristar Airways, Inc. v. Admin. Rev. Bd.*, 650 F.3d 562, 567 (5th Cir. 2011) (a "contributing factor" in the FRSA retaliation context "is any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision.") (citations omitted). Thus, under the relevant language, Burton may establish his *prima facie* case with a "lesser showing than plaintiffs must make in the traditional *McDonnell Douglas* employment action."[6] *Id.*; *see also Araujo*, 708 F.3d at 157 (*prima facie* case under the "contributing factor" analysis is "much easier for a plaintiff to satisfy then the *McDonnell Douglas* standard.").

Under this standard, Burton has established a sufficient causal connection between his injury report and his termination to survive summary judgment. Just two days after Burton filed his injury report, Illinois Central began a formal investigation.[7] It is undisputed that the investigation was occasioned by Burton's injury report; thus, if Burton had not reported his injury, Illinois Central would not have instituted an investigation into the timeliness of Burton's injury report and Burton would not have been fired. This chain of events is sufficient to create a

---

[6] For this reason, the Court rejects as irrelevant cases cited by Illinois Central that utilize the *McDonnell Douglas* burden shifting test.

[7] Although timing alone cannot suffice to establish a *prima facie* retaliation claim under *McDonnell Douglas*, such evidence is sufficient in the FRSA context. *See Araujo*, 708 F.3d at 160.

15

genuine issue of material fact as to whether his injury report was a "contributing factor" to Burton's termination. *See, e.g., Smith–Bunge v. Wis. Cent., Ltd.,* No. 13-cv-2736, 2014 WL 5023471, at *7 (D. Minn. Oct. 8, 2014) (employee's injury report was a "contributing factor" in a railroad's decision to suspend him for failing to timely report injuries); *Ray*, 971 F. Supp. 2d at 888 (same); *see also Koziara*, 2015 WL 137272, at *9 (report of injury was "contributing factor" in adverse employment action that plaintiff claimed was taken due to rule violations that were discovered during investigation prompted by plaintiff's accident report).

Illinois Central suggests that it has rebutted Burton's *prima facie* case by presenting undisputed facts showing that it terminated Burton due to his delay in reporting his injuries in violation of USOR D. The Court disagrees, as there are myriad disputed facts relating to this purported motivation. For instance, there is a genuine issue of material fact regarding whether USOR D was enforced in a uniform manner. McKeehan testified that USOR D specifies that an injured worker has a choice as to whether to report an injury depending on the severity of the injury, and that it was not unusual for Illinois Central workers not to report minor injuries. (McKeehan Dep. Tr. 48-49, Dkt. No. 56-6.) Although Illinois Central maintains that USOR D is strictly enforced, there is sufficient evidence from which a reasonable trier of fact could conclude that Illinois Central selectively enforced USOR D against Burton in retaliation for his reporting his injury.

Additionally, a reasonable factfinder could conclude that Burton did not actually violate USOR D. That regulation requires an injured worker to report an injury "to the proper authority." (Pl.'s Resp. to Def.'s SUF re FRSA Claim ¶ 10, Dkt. No. 67.) Burton discussed his injury with Kone, an acting foreman, on the very evening of the accident, and he spoke with foreman McKeehan about the incident on May 16. (Def.'s Resp. to Pl.'s SUF ¶¶ 13-14, 16, Dkt. No. 64.)

Although Illinois Central argues that a foreman is not a "proper authority" within the meaning of USOR D, it does not provide any evidence of who would constitute "proper authority" under its relevant safety rules.[8] Furthermore, although Illinois Central cites Supreme Court authority indicating that foremen are not "supervisors" within the meaning of Title VII (Def.'s Mot. re FRSA at 5, Dkt. No. 50), the issue here is whether Burton reported his injury to the "proper authority" as defined in USOR D.

As a final example, the Court notes that a reasonable jury could conclude that various statements and testimony evidence animus or pretext. Burton testified at his deposition that prior to filling out his injury report, Hilliard asked him if he was sure he wanted to fill out the report. A reasonable jury could see this as a statement meant to discourage Burton from filling out an injury report, with the subsequent investigation and termination constituting retaliation for doing so. Additionally, although Hilliard now provides an affidavit describing the particular factors that led him to decide on the discipline he imposed on Burton, at Hilliard's deposition he was utterly incapable of identifying a single fact that he considered in rendering his decision. Suffice it to say that a jury may question Hilliard's credibility on the reasons for Burton's termination, and credibility is an issue of fact.

The Court also cannot grant summary judgment in favor of Burton on his FRSA retaliation claim. Again, although there is sufficient evidence to allow his claim to survive summary judgment, there are issues of fact as to whether Burton has established a sufficient causal connection between his injury report and his termination, and whether Illinois Central can

---

[8] Illinois Central cites evidence that foremen are part of the same collective bargaining group as Burton and are not considered part of Illinois Central management. (Pl.'s Resp. to Def.'s FRSA Rule 56.1 St. ¶¶ 11-14, Dkt. No. 67.) However, Illinois Central fails to put forward evidence that either the text of USOR D or the training provided in support of that rule explains the import of that fact to the USOR D reporting requirement.

meet its burden to show, by clear and convincing evidence, that it would have terminated his employment in the absence of any alleged protected activity.

## CONCLUSION

For the foregoing reasons, the Court denies Illinois Central's motions for summary judgment and Burton's motion for summary judgment.

ENTERED:

Dated: January 25, 2016

_____
Andrea R. Wood
United States District Judge